IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 22-cv-2829-WJM-NRN

PURGATORY RECREATION I, LLC, a Delaware limited liability company, and
PURGATORY VILLAGE LAND, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

UNITED STATES OF AMERICA, and
UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture,

    Defendants.

---

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

Before the Court is Defendants United States of America and United States Forest Service's ("USFS" or "Forest Service") (jointly, "Defendants") Motion to Dismiss ("Motion"). (ECF No. 28.) Plaintiffs Purgatory Recreation I, LLC and Purgatory Village Land, LLC[1] (jointly, "Plaintiffs") filed a response in opposition. (ECF No. 39.) Defendants filed a reply. (ECF No. 40.) For the following reasons, the Motion is granted.

### I. FACTUAL ALLEGATIONS[2]

Plaintiffs own Purgatory Ski Resort ("Resort") and an affiliated resort community

---

[1] Plaintiffs and their predecessors who developed Purgatory Resort, its base area, and its water supply are collectively referred to as "Purgatory."

[2] The Factual Allegations section is drawn from the Complaint. (ECF No. 1.) The Court assumes the allegations contained in the Complaint to be true for the purpose of deciding the

1

near Durango, Colorado.  (¶¶ 7–8.)  The Resort is located principally on federal land managed by the Forest Service and operates pursuant to a Special Use Permit ("SUP") administered by the Forest Service.  (¶ 7.)

The Resort was originally developed by Raymond T. Duncan and certain related entities, including T-H Land Co. ("T-H").  (¶ 14.)  Plaintiffs' Complaint centers on certain conditional water rights[3] on the East Fork of Hermosa Creek that were decreed to Duncan and T-H in the 1970s and 1980s ("Hermosa Creek Water Rights").  (¶¶ 10, 12–13.)

In 1991, T-H and the United States completed a land exchange in which the United States conveyed certain federal land on the "front" side of the resort to T-H, and T-H conveyed land, including a tract on the "back" side of the resort, to the United States ("Exchange Land").  (¶¶ 23–24.)  The Exchange Land conveyed to the United States includes areas that had been identified as proposed points of diversion for the Hermosa Creek Water Rights.  (ECF No. 1-2 (1991 general warranty deed ("Land Deed")).)

The terms of the conveyance were memorialized in a land exchange agreement executed in 1990, (ECF No. 1-1 ("Exchange Agreement")), and in a 1991 warranty deed from T-H as grantor to the United States as grantee.  (ECF No. 1-2.)  A second deed conveyed to the United States a water right owned by T-H Land in the Pomona Ditch that derives its supply from Hermosa Creek that was greater than the 0.01 cfs

---

Motion.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Citations to (¶ __), without more, are references to the Complaint.

[3] "'Conditional water right' means a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based."  Colo. Rev. Stat. § 37-92-103(6).

referenced in the Exchange Agreement.  (ECF No. 1-3 ("Water Deed").)  The Exchange Agreement states that T-H would convey "good title, free from all encumbrances," except for those listed on Schedule A.  (ECF No. 1-1 at 4.)  Schedule A identifies "Outstanding Rights" including various easements and rights-of-way but states that there are no reservations of rights.  (*Id*. at 5–6 ("Reservations: None."); *compare id*. at 8–9 (listing United States' reservations from the conveyance to T-H).)  The Land Deed conveys title "subject to" the same enumerated "Outstanding Rights" and without reservations.  (ECF No. 1-2 at 2 ("Reservations: None.").)  No provision in the Exchange Agreement or the Land Deed mentions a right of access to the East Fork of Hermosa Creek surviving after the exchange.  (¶ 25 ("the Hermosa Creek Water Rights . . . were not mentioned in the Exchange Agreement . . .").)

In 2001, Durango Mountain Resort ("Durango") submitted a proposal for a SUP to the Forest Service to drill two test wells in the East Fork of Hermosa Creek watershed.  (¶ 32; *see also* ECF No. 28-1 (Sept. 7, 2001 SUP Response Letter).)  In response, the Forest Service explained that there were "important issues" related to Durango's request to drill and a "more in-depth environmental analysis" would be required.  (ECF No. 28-1.)  Durango submitted three additional SUP proposals between 2002 and 2007.  (¶¶ 33, 43.)

The Forest Service provided substantive responses to these proposals, explaining, *inter alia*, that Durango needed to provide additional information demonstrating that its proposed use was compatible with the Forest Service's management of the East Hermosa Creek drainage and would not jeopardize the long-term survival of the resident Colorado River cutthroat trout, a formally designated

sensitive species that is protected for conservation by numerous state and federal entities. (ECF No. 28-2 (June 10, 2003 SUP Response Letter; ECF No. 28-3 (Dec. 13, 2004 SUP Response Letter); ECF No. 28-4 (Aug. 24, 2006 SUP Response Letter).) In the 2004 and 2006 responses, the Forest Service made clear that it had the authority and discretion to deny Durango's request for access. (ECF No. 28-2 at 1 ("It is Forest Service policy under special uses management to deny proposals that are in conflict with other forest management objectives and can reasonably be accommodated on non-National Forest System lands."); ECF No. 28-4 at 3 ("We believe that the withdrawal of water in the proposed location is inconsistent, and may conflict with, our management of the water to develop and restore fisheries habitat in the upper East Hermosa drainage").)

The allegations in the Complaint suggest that Plaintiffs acquired an interest in Durango at some point between 2013 and 2016. (¶¶ 44–46 (alleging that Purgatory's predecessor submitted a new SUP application in 2013 and that Purgatory engaged in conversations with the Forest Service "[b]eginning in about 2016").)

## II. PROCEDURAL HISTORY

On October 27, 2022, Plaintiffs filed their Complaint. (ECF No. 1.) Plaintiffs bring claims under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), asserting that their predecessor retained an easement that allows Plaintiffs to develop certain unperfected water rights by drilling wells on the National Forest. In Claim I, Plaintiffs seek to quiet title to conditional water rights and to a purported easement to develop those rights under the QTA. In Claim II, Plaintiffs seek a declaratory judgment establishing a right to access federal land to

4

develop their conditional water rights.

### III. LEGAL STANDARDS

**A.      Rule 12(b)(1)**

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing that federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Id.*

**B.      Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy

which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

A court will "typically consider 'only the contents of the complaint when ruling on a 12(b)(6) motion' . . . [b]ut we also will consider 'documents incorporated by reference in the complaint [and] documents referred to in and central to the complaint, when no party disputes [their] authenticity.'" *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 709 (10th Cir. 2021) (citations omitted), *cert. denied*, 142 S. Ct. 2779 (2022).

Rule 12(b)(6) provides for dismissal of claims that are barred by statutes of limitations. *Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz*, 2013 WL 212640, at *4 (D. Colo. Jan. 18, 2013). While statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued on has been extinguished, statute of limitation questions may be appropriately resolved on a motion to dismiss. *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 (10th Cir. 1980).

**C.    Sovereign Immunity**

Sovereign immunity shields the United States and its agencies from suit. *San Juan Cnty. v. United States*, 754 F.3d 787, 792 (10th Cir. 2014). This is so unless "Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text." *Governor of Kan. v. Kempthorne*, 516 F.3d 833, 841

(10th Cir. 2008) (quotation omitted).  Application of the sovereign immunity doctrine precludes a federal court's jurisdiction over a case.  *See United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *see also Rigsby v. United States*, 91 F. App'x 103, 105 (10th Cir. 2004) (a court lacks subject matter jurisdiction where "no sovereign immunity was waived.").  "Consequently, plaintiffs may not proceed unless they can establish that the United States has waived its sovereign immunity with respect to their claim." *Iowa Tribe Of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1232 (10th Cir. 2010).

## IV. ANALYSIS

### A. Quiet Title Act[4]

#### 1. Statute of Limitations Bars Claim I

##### a. *Law*

The QTA is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983).  Through the QTA, Congress waived the federal government's sovereign immunity to "suits seeking to quiet title to certain federal lands," *Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt.*, 363 F.3d 1069, 1071 (10th Cir. 2004), providing that the United States may be sued "to adjudicate a disputed title to real property in which the United States claims an interest."  28 U.S.C. § 2409a(a).  But the QTA's waiver of sovereign immunity is "limited in scope," and "the terms of the

---

[4] Because the Court determines that Plaintiffs' QTA claim is barred by the 12-year statute of limitations, it need not discuss the parties' other arguments concerning the QTA.

[QTA] 'define the extent of the court's jurisdiction.'" *Warren v. United States*, 234 F.3d 1331, 1335 (D.C. Cir. 2000) (quoting *United States v. Mottaz*, 476 U.S. 834, 841 (1986)).

The QTA contains a 12-year statute of limitations, *see* 28 U.S.C. § 2409a(g), which is "strictly construed" in the Government's favor.[5] *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010). A cause of action under the QTA accrues when the plaintiff or his or her predecessor in interest "knew or should have known of the claim of the United States" to the subject property. 28 U.S.C. § 2409a(g); *Rosette, Inc. v. United States*, 141 F.3d 1394, 1397 (10th Cir. 1998). As a federal statute, the QTA "must be interpreted in accordance with principles of federal law," but courts "may properly look to state law as an aid in determining the application of statutory language to specific facts." *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985). "Local practices and local rules are particularly indicative of whether a party should have known a relevant fact." *Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1387 (10th Cir. 1980).

The Tenth Circuit has instructed that the QTA's use of the phrase "should have known" "import[s] a test of reasonableness." *Id*. "Only if it was unreasonable for the [plaintiff] to have failed to discover the claim of the United States should the limitations provision . . . become operative." *Id*. But "[k]nowledge of the claim's full contours is not required" for there to be sufficient notice of a claim under § 2409a(g). *Knapp v. United*

---

[5] Until March 2023, the QTA's statute of limitations, 28 U.S.C. § 2409a(g), was considered to be jurisdictional in the Tenth Circuit. *Kane Cnty., Utah v. United States*, 772 F.3d 1205, 1215 (10th Cir. 2014). In *Wilkins v. United States,* 598 U.S. ___, 143 S. Ct. 870 (2023), the Supreme Court clarified that § 2409a(g), "is a nonjurisdictional claims-processing rule." *Id.* at 881.

*States*, 636 F.2d 279, 283 (10th Cir. 1980).  Rather, "[a]ll that is necessary is a reasonable awareness that the Government claims *some* interest adverse to the plaintiff's."  *Id*.; *see also George v. United States*, 672 F.3d 942, 946 (10th Cir. 2012) (explaining that a "claim" is "some interest adverse to the plaintiff's" or "an assertion of right to something").  Whether the government's claim to the disputed property has merit is irrelevant, and "[o]ne can be on *notice* of a claim even if that claim lacks any legal *merit*."  *Id*. (emphases in original).

        b.    *Analysis*

The parties dispute when Plaintiffs' QTA claim accrued and the 12-year statute of limitations began to run.  According to Defendants, Plaintiffs' QTA claim accrued in 1991, when the Exchange Land was conveyed to the United States.  (ECF No. 28 at 13.)  Defendants argue that T-H knew, or should have known, that the United States claimed an interest adverse to its right to access the East Fork of Hermosa Creek at that time, when the United States accepted title to the Exchange Land "free from encumbrances" other than those expressly identified in Schedule A to the Exchange Agreement.  (*Id.* (citing ECF No. 1-1 at 1, 6, ECF No. 1-2 at 2).)  Thus, Defendants contend that at the latest, "the recording of the warranty deed on July 1, 1991, put T-H—and all of T-H's future successors—on notice that the land it granted to the United States was not burdened by an easement to access the Hermosa Creek Water Rights." (*Id.* (citing *Nile Valley Fed. Sav. & Loan Assoc. v. Sec. Title Guar. Corp. of Baltimore*, 813 P.2d 849, 852 (Colo. App. 1991) ("If a document is properly recorded, the whole world is deemed to have constructive notice of the encumbrance."); *see also In re Bandell Invs., Ltd.*, 80 B.R. 210, 212 (D. Colo.1987).)

9

Additionally, Defendants argue that "[e]ven if it had accrued at some point after 1991, Plaintiffs' QTA claim would still be time-barred because Plaintiffs' predecessors knew or had reason to know that the United States denied the existence of an easement well before 2010 (12 years before Plaintiffs brought suit)."  (ECF No. 28 at 13 (citing *Pine River Irrigation Dist. v. United States*, 656 F. Supp. 2d 1298,1310 (D. Colo. 2009) (reasoning that the QTA's statute of limitations began to run when the United States "denied the easement's existence or limited its use in a manner demonstrating that the government claimed the right to deny the easement.")).)  For support, Defendants rely on the years-long correspondence between the parties concerning Plaintiffs' SUPs, discussed further below.  (*Id.*)

By contrast, Plaintiffs contend that the QTA's statute of limitations was not triggered until October 30, 2010, when "Purgatory first learned the USFS would oppose continuation of one of the Water Rights and 'authorization will not be granted by the Forest Service' to access that right."  (ECF No. 39 at 9; ¶ 39.)  Purgatory purportedly only first became aware of Defendants' position when the United States filed a Statement of Opposition to Plaintiffs' Application for Finding of Reasonable Diligence in Colorado's Water Court and "Purgatory's predecessors could no longer expect a reasonable SUP from" the Forest Service to develop the conditional water rights.  (¶¶ 39, 62.)  With respect to Defendants' argument concerning the Land Deed's silence concerning the water rights, Plaintiffs state that "if the U.S. did not want Purgatory to use the Water Rights it should have acquired them in the Exchange" and "would have needed to provide [equalized exchange values] required under the federal Land Policy and Management Act . . . which it did not do."  (ECF No. 39 at 10.)

10

Having considered both parties' arguments, the Court concludes that Plaintiffs' allegation that their claim did not accrue until 2010 is without merit. Plaintiffs do not and cannot dispute that the Exchange Agreement and Land and Water Deeds are silent as to the Hermosa Creek Water Rights, notwithstanding their argument that the United States should have acquired the water rights in the Exchange. (ECF No. 39 at 10; ¶ 25 ("However, the Hermosa Creek Water Rights and Hermosa Creek Storage Rights were not mentioned in the Exchange Agreement and were not included in the Land Deed or the Water Deed.").)

Colorado adheres to a race-notice recording scheme, Colo. Rev. Stat. § 38-35-10, which means the recording of a deed provides constructive notice to "all the world" of a property claim. *Graham v. United States*, 2022 WL 1288477, at *5 (Apr. 29, 2022, D. Colo) (quoting *Franklin Bank, N.A. v. Bowling*, 74 P.3d 308, 313 (Colo. 2003)). The Tenth Circuit has held that one condition that satisfies the QTA's "should have known" standard is "constructive notice under applicable state recording statutes." *Amoco*, 619 F.2d at 1387–88 (concluding that one of the conditions that will satisfy the "should have known" language of § 2409a(f) and trigger the limitations period is constructive notice under applicable state recording statutes and stating that a party "should have known" of a claim of the United States at the time he was clearly and properly imputed with constructive notice of that claim under local recording statutes). Thus, from the time the land exchange was completed in 1991, Plaintiffs' predecessors (including Durango) knew, or at a minimum should have known, that the United States did not, and would not, recognize an easement to access the Exchange Land to develop the Hermosa Creek Water Rights. *See George*, 672 F.3d 942 at 947 (observing that in *Knapp*, a

11

QTA claim accrued when the plaintiffs learned of the government's claim to some interest in their land by way of a record search—and long before the government did anything adverse to the plaintiff or definitively asserted its claim to title and concluding that "[r]ecords, not actions, were enough to put the plaintiffs on notice there and so they must be here").  Accordingly, the Court finds that the statute of limitations began running in 1991 and expired 12 years later in 2003.

Even if the 1991 Exchange was not sufficient to begin the running of the statute of limitations—which the Court finds it was—the communications between the parties from 2001 to 2007, when Durango submitted four SUP proposals to the Forest Service, would suffice.  (*See* ECF Nos. 28-1–28-4.)[6]  The Court agrees with Defendants' argument that the letters to Plaintiffs' predecessors "repeatedly indicated that the Forest Service would exercise [its authority to control access to the exchange Land]."  (ECF No. 28 at 14 (noting that letters explain that withdrawal of water from East Hermosa Creek is inconsistent with forest Service management of the Colorado River cutthroat trout population in the area, that Forest Service policy prevented the authorization of proposals that could be accommodated on non-Forest Service lands, and that Durango had submitted information to other public agencies demonstrating that non-Forest

---

[6] Although Plaintiffs object to introducing the letters on the basis that they "were neither incorporated by reference in the Complaint nor 'central to the complaint' as required to attach such documents to a motion to dismiss," the Court finds their argument is without merit.  (ECF No. 39 at 10.)  Plaintiffs do not object to the authenticity of the letters.  (*Id.*)  As Defendants emphasize, the letters were expressly referenced and discussed in the Complaint.  (ECF No. 40 at 8 n.2 (citing ¶¶ 32–34).)  In the Tenth Circuit, a court "will consider 'documents incorporated by reference in the complaint [and] documents referred to in and central to the complaint, when no party disputes [their] authenticity.'" *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 709 (10th Cir. 2021).  Therefore, the Court considers the letters concerning the SUPs in ruling on the Motion.

Service lands could be used to support the Resort's then-present and future water needs.).)  These responses put Purgatory on notice well before 2010 that the Forest Service believed it had the authority and right to deny access to the water rights at issue.

Plaintiffs contend that the content of the letters precluded them from concluding that a "peaceful coexistence" was impossible such that they needed to file suit.  (ECF No. 39 at 11.)  For support, they quote various portions of the letters which they argue demonstrate "concern for protecting the trout" but also that the "USFS was working with Purgatory . . . on what science could be gathered to satisfy those concerns and 'the USFS always expressed a willingness to work with Purgatory[]' in that regard."  (*Id.* at 10–11 (quoting portions of letters).)  Plaintiffs state that Defendants never adopted a final decision on the proposals.  (*Id.* at 11.)  They also assert that "the ongoing efforts of the parties to develop conditions to allow operation of the Water Rights during the time of the letters means that USFS's subsequent claim in 2010 started the clock anew."  (*Id.* (citation omitted).)  Finally, Plaintiffs argue that

> [f]or the statute of limitations to begin running during this time as the USFS asserts, Purgatory would have needed to ignore the in-person meetings, communications, and other USFS actions and assume that the USFS had made a final decision on the merits of the SUP proposals that would preclude any "peaceful coexistence," but hid that final decision from Purgatory during their meetings.  Further, that is not what the Forest Supervisor believed.  He testified the USFS position evolved over time until it decided to preclude any use of the Water Rights in opposing the 2010 Water Court case.  Compl. ¶ 41.  Only then was Purgatory on notice that the USFS was asserting an interest that precluded any peaceful coexistence with its access rights.

(*Id.*)

13

Despite Plaintiffs' arguments, the Court again finds the Tenth Circuit's observations in *Rio Grande Silvery Minnow* instructive.  In that case, the Tenth Circuit stated that "the effect of . . . conflicting communications would not have been to create the basis for [the plaintiff] to delay acting in asserting its claim of title."  *Rio Grande Silvery Minnow*, 599 F.3d at 1188.  Rather, "the effect of the conflicting communications . . . should have been to make it even more imperative for [the plaintiff] to file a lawsuit to quiet title.  *Id.*  The court further explained that its "precedent does not allow plaintiffs to wait until the adverse claims of title asserted by them and the United States crystallize into well-defined and open disagreements before commencing a quiet-title action."  *Id.*

This case presents a similar scenario as *Rio Grande Silvery Minnow*, with the USFS's correspondence creating "conflicting communications" or, at the very least, some ambiguity concerning the SUP requests in Plaintiffs' minds.  As such, Plaintiffs were obligated to commence their QTA action at that time, and not wait until late 2022, 12 years after the first purported adverse claim by the United States in 2010, to file their lawsuit.  Thus, the Court finds that "even if conveyance of the Exchange Land to United States without reservation had not already put Plaintiffs' predecessors on notice of the United States' adverse interests, Durango [as Plaintiffs' predecessor] knew or should have known through its years of communication with the Forest Service that the United States would take the position that Durango did not hold a vested right of way or easement to access and develop the Hermosa Creek Water Rights."  (ECF No. 28 at 15.)  The Court finds that Plaintiffs' QTA claim accrued in 1991, and certainly prior to 2010, and dismisses Claim I as untimely under 28 U.S.C. § 2409a(g).

      2.    <u>No Equitable Tolling</u>

In their response, Plaintiffs argue that a recent Supreme Court decision, *Wilkins v. United States*, 142 S. Ct. 870, 881 (2023), "raises the possibility of equitable tolling." However, despite the fact that the Supreme Court held that § 2409a(g) "is a nonjurisdictional claims processing rule," *id.* at 881, the Court agrees with Defendants' statement that the "Supreme Court confirmed that equitable tolling of the QTA's 12-year statute of limitations is not allowed." (ECF No. 40 at 9 (citing *Wilkins*, 142 S. Ct. at 880).) As Defendants explain (ECF No. 40 at 9), the Court reaffirmed its prior reasoning that given the "unusually generous nature of the QTA's limitations time period," the statute "already effectively allowed equitable tolling. . . ." *Id*. (quoting *United States v. Beggerly*, 524 U.S. 38, 48 (1998)).

Further, to the extent Plaintiffs contend that Defendants' communications were somehow ambiguous, giving Plaintiffs reason "to believe Purgatory's rights to access and divert could peaceably co-exist with the USFS's new interest in protecting the trout" (ECF No. 39 at 9), that would not be a basis to toll the statute of limitations; rather, the "effect of the conflicting communications . . . should have been to make it even more imperative for. . . [plaintiff] to file a lawsuit to quiet title." *Rio Grande Silvery Minnow*, 599 F.3d at 1188. Accordingly, the Court finds no basis for equitable tolling of the 12-year statute of limitations here.

**B.**     **Declaratory Judgment Act**

In Claim II, Plaintiffs seek "a declaration of its rights to access and use its Hermosa Creek Water Rights which were decreed to divert on property that was or is now owned by the United States." (¶ 64.) Specifically, Plaintiffs "seek[] a declaratory

15

judgment on all matters described herein to the extent not resolved by the Quiet Title Act . . . ."  (¶ 69.)

However, as stated above, the QTA is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property."  *Block*, 461 U.S. at 286.  And, according to the Tenth Circuit, *Block* applies to DJA claims.  *See Rosette, Inc. v. United States*, 141 F.3d 1394, 1397 (10th Cir. 1998) ("Insofar as [plaintiff's] current claims are all linked to the question of title, the Quiet Title Act provides the exclusive remedy" and "[a]llowing [a plaintiff] to maintain a declaratory judgment action under these circumstances would undermine the policies set forth in *Block* and would render the Quiet Title Act's statute of limitations meaningless."); *see also Rio Grande Silvery Minnow*, 599 F.3d at 1177 n.4 (holding that if the "request for declaratory relief leads directly back to the question of title, and as such, is inextricably linked to that question," then the QTA is the exclusive remedy and any separate declaratory judgment claims are barred).

And, as the Government emphasizes, the DJA provides a remedy in some federal actions, but not a standalone waiver of sovereign immunity that would allow Plaintiffs to sue the United States for a declaratory judgment regarding alleged property rights.  *See United States v. Durango & Silverton Narrow Gauge R.R. Co.*, 2020 WL 9432882, at *2 (D. Colo. July 14, 2020) ("The [DJA], 28 U.S.C. § 2201, does not waive sovereign immunity.") (citing *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 512 (10th Cir. 1994)) (subsequent citations omitted).  The DJA is "a wholly procedural statute and does not extend federal jurisdiction.  Thus, an independent source of jurisdiction is required."  *Id*. at *2 n.2 (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339

U.S. 667, 671 (1950); *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002)).

Plaintiffs' allegation that "the claims asserted in Count II . . . arise under the Constitution and laws of the United States and are closely related to the claims under the Quiet Title Act" fails to sufficiently plead a separate waiver of sovereign immunity. As such, Claim II is also dismissed as time-barred. *See Rio Grande Silvery Minnow*, 599 F.3d at 1177 n.4.

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Defendants' Motion to Dismiss (ECF No. 28) is GRANTED;

2. Plaintiffs' Complaint (ECF No. 1) is DISMISSED without prejudice, as both claims are time-barred;

3. The parties shall bear their own fees and costs; and

4. The Clerk is DIRECTED to enter judgment and terminate this action.

Dated this 15th day of April, 2024.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge